IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In re<br><br>**Tantum Companies, LLC,**[1]<br><br>　　　　　Debtors. | Case No. 23-30407<br><br>Chapter 11 |

### DECLARATION OF MARK COTE IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF

I, Mark Cote, hereby declare, under penalty of perjury, as follows:

1. I am the CEO of the above captioned debtors and debtors-in-possession (the "Debtors"). I have been the CEO of the Debtors since May 15, 2023.

2. In my capacity as the Debtors' CEO, I am familiar with the Debtors' financial affairs, the circumstances giving rise to the Debtors' financial distress, and the Debtors' restructuring prospects.

3. I submit this declaration (the "First Day Declaration") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "First Day Motions").[2]

4. On June 26, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Tantum Companies, LLC (Tax ID: 82-1558256) and BYB Leasing, LLC (Tax ID: 85-2862164).

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed in the applicable First Day Motion.

1

herewith, the Debtors filed a motion seeking joint administration of these Chapter 11 Cases for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5. Except as otherwise indicated below, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by members of the Debtors' management, senior employees, and advisors, or my opinion based on my professional experience. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6. Part I of this First Day Declaration provides background regarding the Debtors, including, but not limited to, the Debtors' corporate structure and debt structure. Part II of this First Day Declaration provides a summary of the events which precipitated these Chapter 11 Cases, and the Debtors' goals in these Chapter 11 Cases. Part III sets forth the relevant details of the various First Day Motions.

## PART I: BACKGROUND REGARDING THE DEBTORS

7. Tantum Companies, LLC ("Tantum"), one of the Debtors herein, is a quick-service, made to order restaurant chain, doing business primarily in the Southeast United States as "Back Yard Burgers" ("BYB").  BYB Leasing, LLC is a subsidiary of Tantum, which is the lessee under certain leases of corporate run restaurants.  Besides its interests as lessee under such leases, BYB Leasing, LLC has no other assets or obligations.   Collectively, the Debtors employ approximately 254 individuals.

8. Founded in 1987, BYB is an established quick service/fast casual restaurant concept.  For over three decades, BYB has established a strong brand presence across its markets

2

4870-5614-2181, v. 7

predicated on offering guests high-quality flame-grilled burgers and sandwiches. BYB is a pioneer in the "Better Burger" category with a rich history rooted in the idea of offering consumers one-of-a-kind homemade burgers using the highest quality ingredients prepared in a way that tastes just as good as a family would prepare in their own back yard. The company's core mission has remained the same since inception and as a result its customers have come to know and appreciate the "home cooked/backyard style" taste of its product and the breadth of its menu.

9. Currently, the Debtors operate five corporate owned restaurant stores located in Mississippi, and Tennessee. In addition to the corporate owned stores, the Debtors have franchise contracts with approximately 14 franchisees located in Tennessee, North Carolina, Florida, Missouri, Kentucky, Arkansas, Illinois, and Mississippi.

A. **Corporate Structure**

10. The Debtors are two separate and privately-held limited liability companies: (i) Tantum Companies, LLC, and (ii) BYB Leasing, LLC ("BYB Leasing"). Tantum is the sole owner of BYB Leasing. Tantum Holdings, LLC is the sole member of Tantum Companies, LLC. Tantum Holdings, LLC is the sole member of Tantum Companies, LLC. Axum Capital Partners Fund I, LLP and Back Yard Burgers, LLC are the owners of Tantum Holdings, LLC.

B. **Debt Structure / Prepetition Loans**

   i. **THE GUARANTY BANK AND TRUST LOANS**

   *The Prepetition Senior Secured Loan*

11. Tantum Companies is obligated to Guaranty Bank & Trust Company ("Guaranty Bank") for a loan (the "Prepetition Loan") under that (i) certain Loan Agreement dated December 8, 2020 between the Tantum and Guaranty Bank (the "Prepetition Loan Agreement")

3

and that (ii) certain Promissory Note dated December 8, 2020 granted by the Debtor in favor of Guaranty Bank in the principal amount of $10,400,000 (the "Prepetition Note"). The Prepetition Loan is set to mature on December 8, 2025. As of the Petition Date, the current outstanding balance due under the Prepetition Loan Agreement and the Prepetition Note was in the approximate amount of $10,861,269.97. The Prepetition Loan Agreement contains customary representations, warranties, and customary material affirmative and negative covenants.

12. The Prepetition Loan was made under the Main Street Lending Program, which was a loan program established by the Federal Reserve to make loans to small and medium sized business impacted by the Covid-19 pandemic. Guaranty Bank serves as the agent bank administering the Prepetition Loan through the Main Street Lending Program.

13. To secure the obligations under the Prepetition Loan Agreement and the Prepetition Note, Tantum granted Guaranty Bank, pursuant to that Security Agreement dated as of December 20, 2020 (the "Security Agreement"), a continuing first priority lien and security interest (collectively, the "Prepetition Lien") in and to substantially all of the Debtors' assets, including cash collateral (the "Prepetition Collateral").

*The Credit Card Facility*

14. In addition to the Prepetition Loan, Tantum also maintained an unsecured credit card facility with the Guaranty Bank (the "Credit Card Facility"). Tantum used the Credit Card Facility to fund many of the expenses of Tantum specifically including necessary expenses leading up to the filing of these bankruptcy cases. As of the Petition Date, the amount owed under the Credit Card Facility was $185,378.47.

*The Equipment Loans*

15. Guaranty Bank also made purchase money equipment loans to Tantum secured by purchase money security interest in certain equipment at three corporate operated stores (the "Equipment Loans") as described below. The current balance on the Equipment Loans is $1,845,257.15.

- a. Loan No. (ending) 6003333 ("Loan 6003333") in the total amount principal amount of $600,917.39, as evidenced by that Promissory Note dated 11/30/21 by Tantum in favor of Guaranty Bank, and that Business Loan Agreement dated 11/30/21 by and between Tantum and Guaranty Bank. Loan 6003333 is secured by a purchase money security interest in certain equipment.

- b. Loan No. (ending) 7003333 ("Loan 703333") in the total amount principal amount of $382,039.44, as evidenced by that Promissory Note dated 6/8/22 by Tantum in favor of Guaranty Bank, and that Business Loan Agreement dated 6/8/22 by and between Tantum and Guaranty Bank. Loan 7003333 is secured by a purchase money security interest in certain equipment.

- c. Loan No. (ending) 3201061 ("Loan 3201061") in the total amount principal amount of $900,082.61, as evidenced by that Promissory Note dated 8/4/21 by Tantum in favor of Guaranty Bank, and that Business Loan Agreement dated 8/4/21 by and between Tantum and Guaranty Bank. Loan 3201061 is secured by a purchase money security interest in certain equipment.

- d. Loan No. (ending) 2203333 ("Loan 2203333") in the total amount principal amount of $218,541.90, as evidenced by that Promissory Note dated 8/26/22 by Tantum in favor of Guaranty Bank, and that Business Loan Agreement dated

4870-5614-2181, v. 7

8/26/22 by and between Tantum and Guaranty Bank.  Loan 2203333 is secured by a purchase money security interest in certain equipment.

### PART II:  SUMMARY OF PRECIPITATING EVENTS AND GOALS OF THESE CHAPTER 11 CASES

16. Like many restaurant brands, BYB has experienced significant headwinds, unprecedented operational challenges and severe pressure on margins. During the pandemic, any chance of dealing with operational issues in the normal course was unprecedented and disruptive to the company's guests and employees. Operational control and management effectiveness was disrupted and exposed the company to weaknesses that were not previously identifiable, and the consequences impacted the financial stability and the potential for financial recovery – which ultimately necessitated the filing of these Chapter 11 Cases.  Some of the specific resulting issues and ongoing challenges include the following: (1) material lease exposure from exited locations; (2) management issues; (3) continued supply chain constraints; (4) tight labor market and wage inflation; (5) corporate stores already challenged by high rents while requiring significant capex; and (6) significant and unsustainable accounts payable build-up stemming from the pandemic.

17. Over the last several months, management has enacted steps to right size the business, streamline, and begin to restructure the company and position it for long-term success. Specific actions include the following, among others: (1) added an experienced and focused management team with targeted expertise in operations, supply chain, marketing,  and franchise relations; (2) established a new leadership led by CEO Mark Cote and industry advisor Craig Miller; (3) significantly pruned store base by eliminating stores which were demonstrating significant sales declines, impaired  facilities, negative store EBITDA, and were unlikely to recover in an acceptable time horizon; (4) focused on re-establishing store operational control and re-deploying our most talented loyal store management toward its profitable operations

6

resulting in positive trends in both sales and cost management; (5) reduced corporate G&A significantly by transferring headquarters from Nashville, Tennessee to Charlotte, North Carolina and consolidating certain corporate functions, creating opportunities for meaningful operating leverage; and (6) negotiated term with some of the key service providers/vendors.

18. While these actions are beginning to yield positive results, and the Debtors expect this trend to continue, the Debtors have been unable to address the significant accounts payable debt that built up during the pandemic. The Debtors therefore determined that this Chapter 11 filing was necessary to avoid any cash drain that would threaten the Debtors' continued operations and to provide the Debtors the opportunity to address the claims and interests of all their stakeholders through a uniform process.

19. The Debtors' main goal is to reorganize under a consensual Chapter 11 Plan which maximizes the value of their estates, and provides the greatest return possible to all of their creditors and stakeholders.

## PART III: FIRST-DAY MOTIONS

A. **Motion of the Debtors for Entry of an Order Directing the Joint Administration of Related Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) (the "Joint Administration Motion")**

20. The Debtors request the joint administration of these Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for the Chapter 11 Cases under the Tantum Companies, LLC case and also request that the caption of each of the Chapter 11 Cases be modified to reflect the joint administration of the Chapter 11 Cases.

21. The Debtors are direct affiliates of each other and constitute "affiliates" within the meaning of section 101(2) of the Bankruptcy Code. Joint administration of the Chapter 11 Cases

7

will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Chapter 11 Cases. Joint administration will also permit the Clerk to use a single general docket for the Cases and to combine notices to creditors and other parties-in- interest of the Debtors' respective estates. Joint administration will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in each of the Chapter 11 Cases.

22.     I understand that if the Court approves joint administration of the Chapter 11 Cases, the Debtors will be able to reduce fees and costs resulting from the administration of the Cases and ease the administrative burden of having to file multiple documents. I have also been advised that joint administration will ease the administrative burden for the Court and all parties to the Chapter 11 Cases and obviate the need for duplicative notices, motions, applications and orders, thereby saving time and expense for the Debtors and their estate. Based on the foregoing, the Debtors believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted.

B.     **Motion of the Debtors for an Order : (I) Approving the Continued Use of their Bank Accounts, Cash Management System and Business Forms; (II) Granting a Waiver of the Requirements of Section 345(b) of the Bankruptcy Code; and (III) Authorizing the Debtors' Banks to Charge Certain Fees and Other Amounts (the "Cash Management Motion")**

23.     By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the maintenance of their bank accounts and continued use of existing business forms; (ii) authorizing but not directing the continued use of their existing cash management system; and (iii) providing any additional relief required in order to effectuate the foregoing. The Debtors also request the right, in their discretion, to (i) pay any bank account related fees; and (ii) close or otherwise modify the terms of certain of the bank accounts and

8

open new debtor-in-possession accounts as may be necessary to facilitate these Chapter 11 Cases and their operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in these Chapter 11 Cases.

24. Further, while the Debtors historically do not keep balances over $250,000.00 in any accounts, should any of the Debtors' accounts exceed FDIC guidelines the Debtors will work with the United States Bankruptcy Administrator for the Western District of North Carolina (the "Bankruptcy Administrator") to get into compliance with such provisions.

25. The continued use of the cash management system and the bank accounts during the pendency of these Chapter 11 Cases is essential to the Debtors' business operations. The Debtors believe that the bank accounts and related cash management system mechanisms are well-suited to the Debtors' business needs and operations. To require the Debtors to close bank accounts and reestablish new accounts would not result in greater administrative controls and would require time and expense to the Debtors' estates. Moreover, permitting the Debtors to continue using their existing bank accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

26. The cash management system is a practical mechanism that allows the Debtors to transfer their revenues to the payment of their obligations that decreases the burdens on the Debtors, and that provides several important benefits, including the ability to: (i) control and monitor revenue; (ii) ensure cash availability; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and

presentment information. Moreover, continued operation of the cash management system is crucial to the Debtors' ongoing business operations.

27. Without the relief requested, I believe the Debtors would be burdened in the effective and efficient maintenance of their financial operations. Such a result would cause significant harm to the Debtors' businesses and the value of their estates. Accordingly, I believe that the relief requested is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**C.     Motion of the Debtors for an Order Authorizing: (I) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs; (IV) Payments for Which Payroll Deductions Were Made; (V) Payment of All Related Costs and Expenses; and (VI) Continuation of Certain Prepetition Employee Programs (the "<u>Employee Wages and Benefits Motion</u>")**

28. By the Employee Wages and Benefits Motion, the Debtors seek entry of entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay and/or perform, as applicable, prepetition obligations to current employees including accrued prepetition wages, prepetition wage checks, salaries, and other cash and non-cash compensation claims (collectively, the "<u>Employee Wage Obligations</u>"); (b) maintain and continue to honor their practices, programs, and policies for their employees that were in effect as of the Petition Date, as such may be modified, amended or supplemented from time to time in the ordinary course, including without limitation, the continuation and maintenance of the Debtors' various employee benefit plans and programs (and to pay all fees and costs in connection therewith, including those that arose prepetition) (collectively, the "<u>Employee Benefit Obligations</u>"); (c) reimburse Employees for prepetition expenses incurred on behalf of the Debtors in the ordinary course of business (the "<u>Employee Expense Obligations</u>"); and (d) pay all related prepetition withholdings

4870-5614-2181, v. 7

and payroll-related taxes and deductions (the "Employer Taxes and Deductions" and collectively with the Employee Wage Obligations, Employee Benefit Obligations, Employee Expense Obligations and Workers' Compensation Obligations, the "Employee Obligations") associated with the Employee Wage Obligations and Employee Benefit Obligations; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment request for payment of any prepetition Employee Obligations.

29. As of the Petition Date, the Debtors employ approximately 254 employees, of which 223 are part-time or hourly and 31 are full-time or salaried employees (the "Employees").

30. The Debtors' Employees perform a variety of critical functions, including operating the six corporate run restaurants. The continued operations of the restaurants are essential to the reorganization of the Debtors.

31. In the ordinary course of business, the Debtors incur payroll obligations for salaries, commissions and hourly wages owed to their Employees. Salaries and hourly wages for the Employees are paid twice a month. The average total monthly payroll obligations are approximately $135,616.00 for the Employees. As of the Petition Date, the Debtors estimate that they owe approximately $67,808.00 to their Employees for prepetition Employee Wage Obligations (collectively, the "Prepetition Wage Obligations"). In addition, the Debtors have contracted out certain back-office accounting functions to INVGR Hospitality ("INVGR"). The Debtors estimate that they owe approximately $13,459.00 to INVGR (the "Independent Contractor Obligation"), some of which may include amounts owed prepetition. The Debtors seek the authority to pay and honor Prepetition Wage Obligations for Employees and the Independent Contractor Obligation, and to continue to honor the Employee Wage Obligations

and the Independent Contractor Obligation on a postpetition basis in the ordinary course of business.

32.     Further, the Debtors are seeking to pay Employee Benefit Obligations, Employee Expense Obligations and Employer Taxes and Deductions, plus amounts due on the current pay cycle.

33.     The Employees are essential to the continued operation of the Debtors' businesses, and the Employees' morale directly affects their effectiveness and productivity. Many of the Employees live paycheck to paycheck and would incur substantial hardship should they not be paid. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. A loss of employee morale and goodwill at this critical juncture would undermine the Debtors' stability, and undoubtedly would have an adverse effect on the Debtors, their customers, the value of their assets and businesses, and their ability to achieve their objectives in chapter 11.

34.     I believe that payment of all prepetition Employee Obligations and payment of the Independent Contractor Obligation in accordance with the Debtors' prepetition business practices will enable the Debtors to retain their employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**D.  Motion of the Debtors for Entry of an Interim Order and Final Order Authorizing the Debtors to Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder, and Renew or Enter into New Policies (the "<u>Insurance Motion</u>")**

35.     By the Insurance Motion, the Debtors request entry of interim and final orders (i) authorizing the Debtors to pay unpaid prepetition premiums associated with the prepetition insurance policies (collectively, the "<u>Insurance Policies</u>") to the extent that the Debtors might discover and determine, in their discretion, that such payment is necessary to avoid cancellation,

default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of the Insurance Policies. The Debtors are requesting this relief solely to the extent consistent with the terms of any interim and final orders approving entry into debtor in possession financing and authorizing use of cash collateral entered by the Court in these Chapter 11 Cases.

36. The Debtors maintain nine (9) Insurance Policies that have been obtained through various third-party insurance carriers (the "Insurance Carriers"), which provide coverage for, inter alia, commercial general liability, workman's compensation and employers' liability, property, umbrella, inland marine, terrorism, cyber, and executive risk. Continuation of the Insurance Policies is essential to the preservation of the Debtors' businesses. Moreover, in many cases, coverage provided by the Insurance Policies is required by regulations, laws, and contracts that govern the Debtors' commercial activities and the general operating order required by the Bankruptcy Administrator.

37. The Debtors pay certain premiums on a periodic basis and others in an annual lump sum. As of the Petition Date, the Debtors do not believe that any prepetition amounts are outstanding under the Insurance Policies.

38. Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred prepetition and premiums will need to be paid in the ordinary course postpetition. Many of the policies are paid on a month to month basis or will expire on a post-petition basis. Most of the policies will expire in July or September 2023. Should the policies

expire during the pendency of the bankruptcy filing, the Debtors will seek to procure extensions to any such policies.

39. The Debtors believe that the Insurance Policies are necessary and essential to the operation of their businesses during these Chapter 11 Cases. Under the terms of the Insurance Policies, the Insurance Carriers may cancel the Insurance Policies for nonpayment upon the Debtors' failure to pay the premium obligations, and such cancellation will seriously harm the Debtors' ability to continue their operations and business in the ordinary course. The Debtors' ability to continue their existing Insurance Policies is essential to the maintenance of their business. Accordingly, the Debtors seek authorization to maintain their existing Insurance Policies, including payment of all monthly obligations, whether prepetition or postpetition, and to renew or enter into new policies as may be required as the annual terms of existing Insurance Policies expire, without further order of the Court, in the ordinary course of business. Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

E. **Motion of the Debtors Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Lender; (IV) Scheduling a Final Hearing Under Bankruptcy Rules 4001(b) and (c); and (V) Granting Related Relief (the "DIP Financing Motion")**

40. As noted herein, the Debtors believe that the best way to maximize the value of their estates, provide the greatest recovery for stakeholders, and preserve the on-going operations of the Debtors is through a Chapter 11 restructuring through a Chapter 11 plan of reorganization.

41. Immediate access to postpetition financing and the use of Cash Collateral is necessary to enhance the Debtors' liquidity, provide necessary working capital during the

14

pendency of these chapter 11 cases, and provide employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course while working towards a Chapter 11 of reorganization. The Debtors determined that the use of Cash Collateral, alone, would not provide sufficient liquidity for the Debtors to continue to operate the remaining stores. If the Debtors are unable to access the DIP Loan and use Cash Collateral, the Debtors' business operations, ability to restructure in these bankruptcy cases, retention of employees, and the ability to satisfy obligations to customers, will be irreparably harmed. For the foregoing reasons, the DIP Loan is in the best interest of the Debtors' estates, creditors and other parties in interest.

42. Accordingly, the Debtors are requesting authority to enter into a secured credit line in an aggregate principal amount of $450,000.00 (the "DIP Loan") with Guaranty Bank as Lender (the "DIP Lender"), and to grant to the DIP Lender postpetition liens and security interests in all of the assets constituting the Prepetition Collateral with such liens securing the DIP Loan having priority *pari passu* with the Prepetition Liens.[3]

43. The material terms of the DIP Loan are as follows:

|  | **MATERIAL TERMS** |
|---|---|
| **Parties** | Lender:    Guaranty Bank and Trust Company<br><br>Borrower: Tantum Companies, LLC |
| **Commitment** | Revolving Line of Credit in total amount of $450,000.00 |
| **Interest Rate** | Variable rate loan priced at a spread of 3.5% over WSJ Prime at the date of closing with a floor of 8%. |
| **Maturity Date** | The DIP Loan shall be due and payable in full upon the earlier of: i) December 31, 2023, and ii) the effective date under any confirmed Chapter 11 Plan. |

---

[3] Upon information and belief, there is no objection by Guaranty Bank, as prepetition lender, or the Main Street Lending Program, to allow the DIP Loan to be secured *pari passu* with the Prepetition Loan.

4870-5614-2181, v. 7

| | |
|---|---|
| **Events of Default** | Events of Default shall include:<br><br>(i) The failure to pay the DIP Loan in full upon the maturity date,<br>(ii) Any sale of material assets of the Debtors under section 363 of the Bankruptcy Code,<br>(iii) The dismissal of these bankruptcy cases, or conversion of such cases to Chapter 7,<br>(iv) Failure to file a plan of reorganization acceptable to the DIP Lender within 120 days, and<br>(v) Breach of any provision of the Interim Order or Final Order or any terms of any Loan Documents. |
| **Modification of § 362** | The automatic stay shall be modified as to DIP Lender to enforce any defaults under this Interim Order or the DIP Loan; provided, however, that upon an event of default, DIP Lenders shall provide ten (10) days' written notice of said default and file the same with the Bankruptcy Court, and if the default remains uncured after the expiration of ten (10) days, DIP Lender shall be authorized to take all actions free of the restrictions of the automatic stay of § 362 of the Bankruptcy Code or any other restraints. |
| **Liens** | The DIP Loan shall be secured by all of the Guaranty Bank Prepetition Collateral (the "DIP Lien"), which shall have a priority *pari passu* to the Prepetition Lien, but with priority over any other prepetition liens in the Prepetition Collateral, to the extent properly secured. The DIP Lien shall be deemed valid, binding, and enforceable upon entry of the Interim Order without the requirement of filing any UCC-1 Financing statements. |
| **Additional Security** | In addition to the DIP Lien, the loan will be secured by an assignment of the management fees due to Axum Capital Partners Management, LLC under that Management Agreement dated January 12, 2012 by and between Axum Capital Partners Management, LLC and Aetius Companies, LLC. |
| **Guaranty:** | The repayment of the DIP Loan shall be further secured by a third party guaranty from Axum Capital Partners Management, LLC. |
| **Fees** | 100 basis points. |
| **Use of Funds** | The Debtors shall use the proceeds of the DIP Loan in a manner consistent with the DIP Orders and Budget. |

16

| | |
|---|---|
| **Additional Material Term and Condition - Reaffirmation Of Credit Card Facility** | As an additional term and condition of the DIP Loan, Tantum shall reaffirm the Credit Card Facility as an unsecured debt of Tantum on a postpetition basis. Such reaffirmed unsecured obligation shall bear interest as variable rate loan priced at a spread of 3.5% over WSJ Prime at the date of closing with a floor of 8%, and shall be paid monthly payments of principal and interest based upon an 84-month amortization, with a maturity date 84 months after entry of the Final Order approving the DIP Loan. The reaffirmed Credit Card Facility shall be secured by a third party pledge and assignment by Axum Capital Partners Management, LLC of management fees payable under that Management Agreement dated January 12, 2012 by and between Axum Capital Partners Management, LLC and Aetius Companies, LLC. |
| **Additional Material Term and Condition - Reaffirmation Of Equipment Loans** | As an additional term and condition of the DIP Loan, Tantum shall reaffirm the Equipment Loans as a secured postpetition obligations of Tantum. Such reaffirmed secured obligations shall bear interest at a rate of 6% per annum, and shall be paid monthly payments of principal and interest based on an 84-month amortization, with a 120-day interest-only period with interest due on a quarterly basis. The Equipment Loans shall mature 84 months after entry of the Final Order approving the DIP Loan. The reaffirmed Equipment Loans shall continue to be secured with the same priority by that equipment that secured the Equipment Loans prepetition. |
| **Adequate Protection** | As adequate protection under sections 361 and 363 of the Bankruptcy Code, for the Debtors' use, consumption, sale, collection or other disposition of the Prepetition Collateral and Cash Collateral, Guaranty Bank shall (i) maintain the Prepetition Liens on the Prepetition Collateral, to the extent and priority that existed prepetition, and (ii) be granted a replacement security interest in and liens on any proceeds, products, offspring, rents, or profits, of the Prepetition Collateral that become property of the Debtors after the Petition Date, which liens described in (i) and (ii) are valid, binding, enforceable and fully perfected as of the date hereof, and shall be junior and subordinate only to the Carve-Out. |
| **Carve-Out** | There shall be a carve-out (the "Carve-Out") for (i) fees under 28 U.S.C. section 1930, (ii) any fees and expenses owing to the Clerk of Court, and (iii) any allowed but unpaid and outstanding reasonable fees and disbursements of professionals retained in these bankruptcy cases in the |

17

| | |
|---|---|
| | amounts set forth in the Budget attached as Exhibit A to the DIP Financing Motion not to exceed $50,000.[4] |
| **DIP Lender Fees/Expenses** | The Debtors shall pay all of DIP Lender's reasonable expenses incurred in connection with preparation, making and administering the DIP Loan, including attorneys' fees and expenses. Such amounts shall be payable on demand but subject to review by Debtors' counsel, the Bankruptcy Administrator and any official committee appointed herein on twenty (20) days' written notice of demand for payment. |
| **Waivers** | The Debtors waive all rights of the estate to assert against Guaranty Bank and/or DIP Lender or any of their Collateral a right to surcharge under § 506(c) of the Bankruptcy Code or to invoke the doctrine of marshaling with respect to any Prepetition or Postpetition Collateral. |
| **Stipulations** | Subject to entry of a final order granting the Motion, the Debtors stipulate and agree that the Prepetition liens and security interests of Guaranty Bank are valid, enforceable, properly perfected, and enforceable in all respects; provided, however, that any party in interest with standing to do so shall have sixty (60) days from the date of entry of a final order to file an adversary proceeding to assert any claim or cause of action against Guaranty Bank with respect to its Prepetition liens, security interests, obligations or otherwise, failing in which such any right of any party to challenge the same shall be waived, barred and discharged. |

44. The Debtors have determined that the DIP Loan is the best, and likely the only, financing option available under the circumstances to address the Debtors' working capital needs, and no other entity would be willing to provide financing on any better terms.

45. I believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

---

[4] There is a line item in the budget attached to the DIP Financing Motion for any professionals retained by an official committee of unsecured creditors in these bankruptcy cases, but there is no amount set forth this interim budget. In the event that an official committee of unsecured creditors is appointed in these cases, the Debtors will update the budget to include an amount for committee professionals that shall remain in compliance with the budget as approved by DIP Lender.

18

**F.    Debtors' Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Assurance of Payment (the "Utilities Motion")**

46. In connection with the operation of their businesses, the Debtors obtain electricity, natural gas, water, telephone, security and/or similar services with various utility companies (collectively, the "Utility Providers").

47. Uninterrupted utility services are essential to ongoing operations and, therefore, to the ultimate success of the Debtors' reorganization. Should the Utility Providers refuse or discontinue service, even for a brief period, Debtors' business operations would be disrupted. The impact on the Debtors' ability to conduct their businesses would be significant and would jeopardize the Debtors' reorganization efforts. It is therefore critical that utility services continue uninterrupted.

48. To avert disruption to their businesses, the Debtors would be required to pay whatever amounts are demanded by the Utility Providers to avoid the cessation of necessary services. Accordingly, the Debtors seek the entry of an order prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition invoices, authorizing the Debtors to pay a deposit of one month's average billing to the Utility Providers, deeming Utility Providers adequately assured of future performance, and establishing procedures for determining requests for additional adequate assurance of payment.

49. The Debtors submit that their ability to continue paying for utility services is adequately assured for a number of reasons. First, the Debtors should have adequate liquidity through their operations and cash on hand to pay for postpetition utility services on a current basis. Additionally, the budgets for the DIP Loan Facility anticipate paying for the services in the

ordinary course. Finally, the Debtors propose to make a deposit of one month's average billing with each Utility Provider.

50. I am advised by counsel that under the relief requested in Utilities Motion, the Utility Providers retain the right to seek additional adequate assurance.

51. Accordingly, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates and their creditors.

## PART IV:  CONCLUSION

For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions and I respectfully request the Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 27, 2023

> */s/ Mark Cote*
> Mark Cote

4870-5614-2181, v. 7